E-FILED
Friday, 16 March, 2007  04:04:42 PM
Clerk, U.S. District Court, ILCD

## UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF ILLINOIS

**TIBERIUS MAYS,**
            **Plaintiff,**

                  **vs**                                        **04-1001**

**DONALD SNYDER, et al.,**
            **Defendants.**

### OPINION

Before the court are Defendants, Donald Snyder, Jr. Manuel Rojas, Kurk Gaskill, Blair Leibach, Mary Nichols, Timothy Wright, Douglas Cravens, Marvin Cooley, Wanda Bass and Sheldon German's summary judgment motion, d/e 64, and the plaintiff's response, d/e 77.

### Standard

A party moving for summary judgment must show, from the "pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, ..." that there is no genuine issue of material fact and that the "moving party is entitled to judgment as a matter of law. *Outlaw v. Newkirk*, 259 F.3d 833, 837 (7th Cir.2001), *citing Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); Fed.R.Civ.P.56(c) This burden can be satisfied by " 'showing'--that is, pointing out to the district court--that there is an absence of evidence to support the nonmoving party's case." *Celotex*, 477 U.S. at 325. If such a showing is made, the burden shifts to the non-movant to "set forth specific facts showing that there is a genuine issue for trial." Fed.R.Civ.P. 56(e); *Outlaw*, 259 F.3d at 837. A nonmoving party cannot rest on its pleadings, but must demonstrate that there is admissible evidence that will support its position. *Tolle v. Carroll Touch, Inc.*, 23 F.3d 174, 178 (7th Cir.1994). Credibility questions "defeat summary judgment '[w]here an issue as to a material fact cannot be resolved without observation of the demeanor of witnesses in order to evaluate their credibility.' " *Outlaw*, 259 F.3d at 838, citing Advisory Committee Notes, 1963 Amendment to Fed.R.Civ.P. 56(e)(other citations omitted). In determining whether factual issues exist, the court must view all the evidence in the light most favorable to the non-moving party. *Beraha v. Baxter Health Corp.*, 956 F.2d 1436, 1440 (7th Cir.1992).

### Background

The Plaintiff, Tiberius Mays, is a prisoner in the Illinois Department of Corrections.  On January 2, 2004, he filed a petition to proceed in forma pauperis and submitted a complaint brought pursuant to 42 U.S.C. §1983.  In his complaint, ultimately filed on August 30, 2004, the Plaintiff alleges the Defendants violated the Plaintiff's First, Eighth, and Fourteenth Amendment rights while he was housed at the Hill and Danville Correctional Centers.

Specifically, Plaintiff alleges the following violations at the Hill Correctional Center:  1) Defendants Snyder, Pierson, Bass, Rojas, Gaskill, German, and Cravens violated Plaintiff's First and Fourteenth Amendment rights by unconstitutionally disciplining him for a December 29, 2001 Disciplinary Report for allegedly receiving and eating a regular tray of fish and cheese which would not have been in compliance with the Plaintiff's vegan diet; 2) Defendant German violated Plaintiff's First and Fourteenth Amendment rights when he filed the aforementioned retaliatory Disciplinary Report against the Plaintiff because he had a lawsuit against Hill Correctional Center employees and because Plaintiff was able to have two prior Disciplinary Reports expunged; and 3) Defendant Gaskill violated Plaintiff's rights by filing a false incident report on December 29, 2001. (Plaintiff's Complaint, ¶ 1-25, 52-57).

Plaintiff alleges the following violations at the Danville Correctional Center:  1) Defendants Leibach, Wright, Nichols, and Cravens violated Plaintiff's First Amendment rights when they denied the Plaintiff his right to practice his religion by not providing the Plaintiff with a vegan diet once he asked for it and forcing him to have an established religious leader verify that the Plaintiff was a follower of the African Hebrew Israelite faith prior to being approved for the vegan diet; and 2) Defendant Cooley violated Plaintiff's Eighth Amendment rights by not providing the Plaintiff minimally adequate state issued clothing for the seasons. (Plaintiff's Complaint, ¶ 26-51, 58-62).

## Material Facts[1] Claimed to be Undisputed

These facts are set forth for purposes of this order only and are set forth in the light most favorable to the plaintiff.  *Beraha v. Baxter Health Corp.,* 956 F.2d 1436, 1440 (7th Cir.1992). Many are taken verbatim from the defendants' undisputed facts, to the extent not disputed by the plaintiff.  Where a dispute exists, the plaintiff's version is set forth as fact, to the extent his affidavit is based on personal knowledge, corroborating documents, and he is competent to testify to the matters stated therein. *Beraha v. Baxter Health Corp*., 956 F.2d 1436, 1440 (7th Cir.1992).

1.    Defendant Snyder did not sign his name to the Administrative Review Board responses concerning Plaintiff's grievances. (Exhibit A, Douglas Cravens Affidavit, ¶ 4, d/e 65).
2.    Instead, Administrative Review Board member Sandra Kibby-Brown[2], a designee for Defendant Snyder, signed the Administrative Review Board responses.  (Id.).  Ms. Brown did not sign her full name.  She signed using her initials only.  (Exhibit A, d/e 65).

---

[1]Many of the plaintiff's assertion of disputes were really not disputes and many were not supported; and many of his additional material facts were unsupported, immaterial and argumentative and therefore are not considered.

[2]. Sandra Kibbey-Brown apparently was authorized by the Director, Snyder to review and sign appealed grievances on his behalf.

3.    Defendant Cravens, an Administrative Review Board member, addressed Plaintiff's appeals concerning being taken off of the vegan diet at Hill Correctional Center, a December 29, 2001 Disciplinary Report, request for the vegan diet at Danville Correctional Center, and inadequate state issued clothing at Danville Correctional Center. (Exhibit A, Douglas Cravens Affidavit, ¶ 7, d/e 65).

4.    Defendant Snyder did not review the grievances at issue or the Administrative Review Board's decisions and would not have any independent knowledge of what Plaintiff had alleged in his grievances.  (Id., ¶ 6).

5.    Based on Defendant Cravens' review of Plaintiff's grievances, counselor's responses, and the grievance officer's responses, Craven determined that it appeared that the issues the Plaintiff had raised in the grievances had been appropriately addressed at the institution. (Id., ¶ 8-9).

6.    Defendant Cravens was not personally involved in institutional disciplinary hearings as they are handled by correctional staff at that particular correctional institution. (Id.,¶ 11).

7.    Defendant Cravens was not personally involved with the institutional disciplinary hearing concerning Plaintiff's December 29, 2001 Disciplinary Report and was not asked to determine whether or not Plaintiff should or should not be found guilty of said Disciplinary Report or what type of discipline, if any, Plaintiff should receive.  (Id., ¶ 12).

8.    Defendant Cravens was not personally involved with the institutional determinations concerning the Plaintiff's request for a vegan diet or what procedures the Plaintiff had to follow when requesting a religious diet. (Id., ¶ 14).

9.    Defendant Craven reviewed the Plaintiff's grievances, the counselor's responses, and the grievance officer's responses and based on his review, he determined that it appeared that the issues Mr. Mays had raised in the grievances had been appropriately addressed at the institution.  Cravens, therefore, recommended that the appeals of the grievances be denied or considered moot.  (Cravens Affidavit, ¶¶ 8-10.)

10.   Plaintiff is an African Hebrew Israelite and because of his religion he needs a vegan diet. (Plaintiff's Complaint, p. 1-2).

11.   A vegan diet consists of fleshless meals where no kinds of meat or flesh products or dairy products are consumed. (Exhibit B, Manuel Rojas Affidavit, ¶ 10, d/e 65).

12.   Special religious diets are expensive and require additional administrative attention to implement. For example, special outside vendors may be required to supply the food for the diet, contracts for outside vendors have to be approved which require special monetary authorization for purchases from said vendors.  Furthermore, depending on the diet and staffing concerns, additional staff may be needed to administer the religious diet to the inmate(s). Therefore, an attempt is made to limit special religious diets to those inmates who hold a sincere belief and faithfully observe such diets.  (Exhibit B, Manuel Rojas Affidavit, ¶ 3).

13.   Prior to receiving a vegan diet, an inmate must make a request for the diet. The Illinois Administrative Code requires that the request contain written verification that the inmate is a member of a faith group that requires adherence to a particular diet and the specific requirements of the diet. 20 Ill. Admin. Code §425.70(c).  (Exhibit B, Manuel Rojas Affidavit, ¶ 4).

14.   Eligibility to receive an alternative diet for a specific religious reasons is determined by the facility chaplain who ordinarily confers with a religious leader or faith representative of the faith group at issue.  20 Ill. Admin. Code §425.70(c).  (Exhibit B, Manuel Rojas Affidavit, ¶ 5).

15.   The facility chaplain and religious leader or faith representative may interview the committed person. 20 Ill. Admin. Code §425.709(c).  (Exhibit B, Manuel Rojas Affidavit, ¶ 5).

16.   This request and verification process is the same at all of the Department of Corrections' facilities and is required for all inmates requesting a religious diet.  (Exhibit B, Manuel Rojas Affidavit, ¶ 6).  However, the plaintiff alleges that the verification process for the vegan diet has been different for the plaintiff at every prison that he has been in when he requested a religious diet.

17.   Once the inmate has provided this documentation and the information is verified, the inmate signs a Religious Dietary Agreement.  (Exhibit B, Manuel Rojas Affidavit, ¶ 11; Exhibit C, Sheldon German Affidavit, ¶ 6).

18.   The Religious Dietary Agreement requires that the inmate follow the guidelines/refrain from eating and possessing any foods that did not meet the requirements of the diet and that the inmate's participation in the diet would be closely monitored.  Specifically, the Agreement provides that "[p]articipation depends upon [the inmate's] agreement to follow the guidelines set forth in this contract."  Paragraph 4 of the Agreement provides Ensure that no food that is not a part of your requested diet is in your possession." (Exhibit B, Manuel Rojas Affidavit, ¶ 12; see also Mays' Exhibit 4 [78]).

19.   The Religious Dietary Agreement also provides that the diet could be terminated if the inmate was found to be non-compliant.  (Exhibit B, Manuel Rojas Affidavit, ¶ 13).

20.   Mr. Mays signed such an agreement. (Exhibit B, Manuel Rojas Affidavit, ¶ 14).

21.   On December 29, 2001, Defendant Gaskill wrote an Incident Report about witnessing the Plaintiff accepting a regular food tray instead of his vegan food tray.  (Plaintiff's Complaint, Plaintiff's Exhibit 2).

22.   The Plaintiff does not know why Defendant Gaskill wrote the December 29, 2001 Incident Report.  (Exhibit D, Plaintiff's Deposition, p. 40, l. 5-18).

23.   Defendant Gaskill informed Defendant German that the Plaintiff had went through the serving line and took a regular food tray, i.e. non-vegan, even though the Plaintiff was on a vegan diet.  (Exhibit C, Sheldon German Affidavit, ¶ 3).

24.   As a result of this information, Defendant German then observed the Plaintiff eating from a tray that contained a fish sandwich and macaroni and cheese.  (Exhibit C, Sheldon German Affidavit, ¶ 4).  The plaintiff admits that he ate fruit the regular tray.   (Plaintiff's exhibit A, Mays' Affidavit, ¶ 16, [78]).

25.   These items are not served on the vegan diet at Hill Correctional Center and as a vegan, Plaintiff is not to consume said products as they are non-vegan. (Exhibit C, Sheldon German Affidavit, ¶ 5).

26.   Plaintiff admits that on December 29, 2001, he did, at some point in time, have another inmate's tray in his possession. (Exhibit D, Plaintiff's Deposition, p. 37, l. 1-17).

27.   When Defendant German witnessed Plaintiff's conduct, he was aware that Plaintiff had to sign a Religious Dietary Agreement and that a vegan diet required that special foods

4

be purchased, prepared, and served to the inmate on said diet.  (Exhibit C, Sheldon German Affidavit, ¶ 6-7).

28.   Since special efforts and money had been made to provide the vegan food trays, it was necessary to insure that those individuals who had requested a vegan diet receive their vegan diet food tray and not a non-vegan food tray.  (Exhibit C, Sheldon German Affidavit, ¶ 8).

29.   Pursuant to Departmental rule 20 Ill. Admin. Code §504.30(b), if Defendant German witnesses or if he receives information from a reliable witness, that an inmate is violating Departmental rules, with the exception of the violations listed in 400 series of Table A, he is required to write a Disciplinary Report if he believes that an IDR is not necessary to resolve the situation .  (Exhibit C, Sheldon German Affidavit, ¶ 9, Mays' Exhibit Z [78]). The plaintiff was charged with violating Rule 308 and 309, thus German was required to write a disciplinary report against the plaintiff.

30.   Since Defendant German witnessed the Plaintiff abuse his vegan diet by eating from a regular food tray, he wrote the Plaintiff a Disciplinary Report for violating Departmental rules 308 – Contraband/Unauthorized Property and 310 – Abuse of Privileges. (Plaintiff's Complaint, Plaintiff's Exhibit 1; Exhibit C, Sheldon German Affidavit, ¶ 10).

31.   Plaintiff was served the Disciplinary Report on December 30, 2001.  (Plaintiff's Complaint, Plaintiff's Exhibit 1).

32.   Even if the Plaintiff had a lawsuit against Hill Correctional Center employees or had two prior Disciplinary Reports expunged, Defendant German would have still been required to write the Plaintiff a Disciplinary Report based on the information provided to him and what he observed.  (Exhibit C, Sheldon German Affidavit, ¶ 14).

33.   As a Lieutenant, German would not have looked at an inmate's masterfile prior to writing a Disciplinary Report to see if it contained Disciplinary Reports, hearings concerning Disciplinary Reports, and any discipline imposed concerning same.  (Exhibit C, Sheldon German Affidavit, ¶ 12).

34.   As a Lieutenant, German had no personal involvement in the handling of inmate lawsuits against Hill Correctional Center or it's staff.  (Exhibit C, Sheldon German Affidavit, ¶ 13).

35.   Defendant German did not tell the Plaintiff that he wrote the December 29, 2001 Disciplinary Report because of Plaintiff's prior Disciplinary Reports.  (Exhibit D, Plaintiff's Deposition, p. 73, l. 5-13).

36.   Once Defendant German wrote the December 29, 2001 Disciplinary Report, his involvement with said Report was finished and it was then up to the institutional Adjustment Committee or Program Committee to determine if the facts stated in the Disciplinary Report did, in fact, violate Departmental rules.  (Exhibit C, Sheldon German Affidavit, ¶ 15).

37.   Defendant German was not involved in the disciplinary hearing concerning the December 29, 2001 Disciplinary Report nor was he asked whether or not the Plaintiff should be found guilty of the Disciplinary Report or what, if any, discipline he should receive. (Exhibit C, Sheldon German Affidavit, ¶ 16).

38.   Defendant German was not involved in decisions concerning whether or not an inmate was to receive a religious diet.  (Exhibit C, Sheldon German Affidavit, ¶ 17).

39. Defendant German wrote the disciplinary report against the plaintiff, however, German was not involved in determining whether or not the Plaintiff should be removed from the vegan diet.  (Exhibit C, Sheldon German Affidavit, ¶ 18 [65]).

40. Defendant Rojas received a copy of a December 29, 2001 Incident Report written by Defendant Gaskill. (Exhibit B, Manuel Rojas Affidavit, ¶ 15).

41. The Incident Report was forwarded to Defendant Rojas by Defendant Bass. (Exhibit B, Manuel Rojas Affidavit, ¶ 16).

42. Food Service Supervisors have a duty to report violations of the vegan diet guidelines. (Exhibit B, Manuel Rojas Affidavit, ¶ 19).

43. When Defendant Rojas receives these reports, he takes them very seriously due to special purchasing and additional money and efforts these diets require.  (Exhibit B, Manuel Rojas Affidavit, ¶ 20).

44. As a result of the information provided to Defendant Rojas, he also decided to check the Plaintiff's commissary purchases to see if he had purchased commissary items that were prohibited by the vegan diet.  (Exhibit B, Manuel Rojas Affidavit, ¶ 21).

45. Defendant Rojas discovered that on December 5 and 19, 2001, the Plaintiff had purchased items that contained milk products or meat, i.e. Hostess pies, pecan pies, tuna, cheese and Snickers bar.  (Exhibit B, Manuel Rojas Affidavit, ¶ 22).

46. Given the information Defendant Rojas received, he believed that the Plaintiff was not following the requirements of his religion, the vegan diet, and the Religious Dietary Agreement.  (Exhibit B, Manuel Rojas Affidavit, ¶ 23).

47. In accordance with Departmental procedure, Defendant Rojas discussed this issue with Defendant Bass.  (Exhibit B, Manuel Rojas Affidavit, ¶ 24).

48. Defendant Bass agreed that it appeared that the Plaintiff was not following the requirements of his religion, the vegan diet, and the Religious Dietary Agreement. (Exhibit B, Manuel Rojas Affidavit, ¶ 25).

49. Therefore, Defendant Bass told Defendant Rojas to follow the procedures established in the Religious Dietary Agreement and take the Plaintiff off of the diet.  (Exhibit B, Manuel Rojas Affidavit, ¶ 26).

50. On January 3, 2002, Defendant Rojas sent a memorandum to the Dietary Manager which stated that since the Plaintiff had violated his religious diet agreement, he would be off the diet until further notice.  (Plaintiff's Complaint, Plaintiff's Exhibit 5; Exhibit B, Manuel Rojas Affidavit, ¶ 27).

51. There is no Departmental rule that requires a Chaplain to wait to remove an inmate from a religious diet until after a hearing and determination has been made about a Disciplinary Report concerning failure to follow the religious diet.  (Exhibit B, Manuel Rojas Affidavit, ¶ 28).

52. Even if the Plaintiff had a lawsuit against Hill Correctional Center employees or had two prior Disciplinary Reports expunged, Defendant Rojas would have still had the discretion to remove the Plaintiff from his diet if it appeared that he was not following the diet. (Exhibit B, Manuel Rojas Affidavit, ¶ 30; see also Mays' Exhibit 4 [78].

53. A few days after the Plaintiff's removal from the vegan diet, he spoke with Defendant Rojas.

6

54.     Defendant Rojas did not pursue the issue any further.  (Exhibit B, Manuel Rojas Affidavit, ¶ 31).

55.     Since the Plaintiff was found to be non-compliant with the vegan diet, the Religious Dietary Agreement provided that he would have had to wait, Rojas believed the plaintiff would have to wait at least 30 days before re-applying for reinstatement of the diet. (Exhibit B, Manuel Rojas Affidavit, ¶ 32).  However, the plaintiff's Exhibit 4, the Religious Dietary Agreement provides that "in the event your diet privileges are discontinued due to default, you may not reapply to be reinstated into the program until sixty (60) days have passed.  If you lose your privileges a second time for default, you may not reapply to the program for a minimum of nine (90) days."

56.     Reinstatement of the diet may have required the Plaintiff to re-verify his religion and religious dietary requirements since during this time frame, the Chaplains were discovering that many of the individuals claiming to need or be on the vegan diet were lying in order to have the vegan diet.  (Exhibit B, Manuel Rojas Affidavit, ¶ 33).

57.     On January 8, 2002, Plaintiff had a Program Unit hearing in which he provided a written statement, but was found guilty of violating Department Rule 308 and the recommended discipline was a loss of commissary privileges for 14 days and noted that Plaintiff should be taken off of the vegan diet.  (Plaintiff's Complaint, Plaintiff's Exhibit 3).

58.     Plaintiff was served the recommendation on January 14, 2002. (Plaintiff's Complaint, Plaintiff's Exhibit 3).

59.     On March 20, 2002, Plaintiff transferred to the Danville Correctional Center.  (Plaintiff's Complaint, ¶ 26).

60.     A March 28, 2002 memorandum from Defendant Wright was sent to the Plaintiff stating that Plaintiff's request for a special religious diet had been received. (Plaintiff's Complaint, Plaintiff's Exhibit 17).

61.     In the March 28, 2002 memorandum, Plaintiff was notified that in order to proceed with his religious diet request, he would need to provide written verification from a possible to locate religious leader claiming his affiliation, dietary needs, and any special needs. (Plaintiff's Complaint, Plaintiff's Exhibit 17).

62.     On April 9, 2002, a memorandum to the Plaintiff stated that he had not provided written verification of his faith and that as soon as he did, Plaintiff would be provided the contract for the vegan diet. (Plaintiff's Complaint, Plaintiff's Exhibit 18).

63.     On May 3, 2002, a letter to the Plaintiff stated that a review of his file and commissary purchases had been performed concerning his diet and it appeared that Plaintiff was not consuming items that were part of the vegan diet. (Plaintiff's Complaint, Plaintiff's Exhibit 21).

64.     Plaintiff was placed on the vegan diet at Danville in October or November 2003. (Exhibit D, Plaintiff's Deposition, p. 52, l. 9-14).

65.     When Plaintiff transferred to Danville Correctional Center, he had the following clothing items: 1 pair of house slippers, 1 pair of shower shoes, 1 pair of gym shoes, 1 belt, 3 boxer undershorts, 2 T-shirts, 1 thermal underwear, 2 pairs of socks, 2 sweat pants, 2 sweatshirts, 1 jacket, 1 cap, 1 hat, 1 pair of gloves, 1 pair of gym shorts and 2 blue shirts that were unauthorized. (Exhibit E, Marvin Cooley Affidavit, ¶ 3).

66.     When an inmate transfers to Danville, he is provided a winter jacket, three shirts, three pants, one pair of tennis shoes, three pairs of socks, three t-shirts, and three briefs. (Exhibit E, Marvin Cooley Affidavit, ¶ 4).

67.     The amount of the items provided may vary depending on clothing availability and how many of a particular item an inmate already has in his possession.  (Exhibit E, Marvin Cooley Affidavit, ¶ 5).

68.     When the Plaintiff transferred to Danville, about March 21, 2002, he would have been provided the above clothing. (Exhibit E, Marvin Cooley Affidavit, ¶ 6).  The plaintiff claims he received an all purpose jacket (In his complaint, he alleges he received a coat.) three lightweight pants and three short sleeved shirt, three briefs, two T-shirts (In his complaint he alleges he received three T-shirts.) and two [pairs] of socks.  (Plaintiff's Exhibit U, d/e 78.)  He did received any shoes on this date (Plaintiff's Statement of Additional Undisputed Facts [78], but he admits (see his admission of fact no. 65 [78] he already had a pair of gym shoes.  Further, on or about May 29, 2002, he received a pair of lightweight canvas shoes.  (Plaintiff's Additional Undisputed Facts [78]).

69.     Providing inmate clothing for the hundreds of inmates at Danville is very expensive. (Exhibit E, Marvin Cooley Affidavit, ¶ 9).

70.     Prior to 2002, the Department of Corrections decided that due to budgetary constraints and the rising costs associated with running the Department, only inmates who have outside work assignments at Danville may be provided a raincoat, overshoes, rubber boots, rubberized gloves, leather gloves, or cotton gloves free of charge.  (Exhibit E, Marvin Cooley Affidavit, ¶ 10).

71.     Plaintiff was seen in the Health Care Unit on March 23, 25, April 25, May 4, 16, 17, July 24, September 24, October 24, 31, November 27, December 12, 23, 26, 2002; January 6, 10, 24, March 6, April 7, and 14, 2003.  (Exhibit F, Mary Woodard Affidavit, ¶ 6).

72.     Of the times the Plaintiff was seen in the Health Care Unit, the only time noted in which he complained of having a cold or cold like symptoms was on September 24, 2002[3]. (Exhibit F, Mary Woodard Affidavit, ¶ 6).

73.     On September 24, 2002, it was observed that the Plaintiff's lungs were clear, but he was partially congested when he talked. (Exhibit F, Mary Woodard Affidavit, ¶ 6).

74.     The Plaintiff was given CTM, an allergy/cold medicine, and was to take one tablet twice a day for 6 days and he was also given an Elbuterol inhaler refill.  (Exhibit F, Mary Woodard Affidavit, ¶ 6).

75.     Plaintiff has a history of having asthma. (Exhibit F, Mary Woodard Affidavit, ¶ 6).

76.     On December 29, 2001, Defendant German wrote the plaintiff an IDR for Contraband, Unauthorized property, and abuse of privilege after being informed by Defendant Gaskill that the plaintiff was a vegan.

---

[3]The plaintiff disputes this and says that he complained of having cold or cold-like symptoms more than one time to the hospital staff at Danville and he attaches Exhibit 13 [78]. However, a review of that exhibit does not show that the plaintiff complained of cold or cold-like symptoms.

8

77.   On December 29, 2001, Defendant Gaskill informed Defendant German that the plaintiff was on the vegan diet.

78.   The plaintiff allowed another prisoner to eat some of his food off his vegan tray for the fruit off the Sutton's tray.

79.   On January 6, 2002, prior to the disciplinary hearing, the plaintiff filed a grievance about Defendant Rojos' decision to remove him from the vegan diet.  (Plaintiff's Exhibit I [78])

80.   On January 9, 2002, plaintiff wrote defendant Pierson a request slip asking immediate placement back on the vegan diet for First Amendment and due process violations. (Plaintiff's Exhibit G [78]).

81.   On January 14, 2002, Defendant Pierson sent plaintiff a memorandum stating that "Every effort has ben made to accommodate your die.  By your accepting and eating of a regular tray, you have shown there is not a need to supply a specific diet at this time, and you will be able to select adequate and appropriate items from the regular menu until a need is shown otherwise."  (Plaintiff's Exhibit H [78]).

82.   On January 16, 2002, plaintiff filed a grievance about Defendant German's IDR on December 29, 2001. (Plaintiff's Exhibit J [78]).

83.   In a January 30, 2002 memorandum, Defendant Rojas advised the grievance officer that he followed procedure as written in the Religious Diet contract.  Rojas further stated it had been reported to him that Mays violated his contract and Rojas had been ordered to disallow Mays' vegan tray.  (Plaintiff's Exhibit K [78]).

84.   The position of  Senior Chaplin at Hill Prison is detailed in the Illinois Department of Central Management Services.  (Plaintiff's Exhibit L [78]).

85.   On February 15, 2002, Defendant Pierson concurred on the denial of plaintiff's grievance filed January 6, 2002, about removal from the vegan diet.  (Exhibit J [78]).

86.   On March 18, 2002, Defendants Craven and Snyder's designee denied plaintiff's appeal to the Director for reinstatement of vegan diet.  (Exhibit M [78]).

87.   According to the tenets of the plaintiff's faith, he was a vegan who ate no meat or meat by products.  (Exhibit B & A, Mays Affidavit, ¶ 63 [78]).

88.   Plaintiff was denied a vegan diet which is a tenet of his faith from January 4, 2002, to March 20, 2002, at Hill prison totaling 75 days and 225 meals.  (Exhibits F & A, Mays Affidavit ¶ 64 [78]).

89.   On March 22, 2002, plaintiff spoke with Defendant Wright about being placed on vegan diet for Passover, however, Defendant Wright stated the plaintiff had to have letter verifying religious affiliation from outside leader.  (Exhibit A, Mays Affidavit ¶ 66 [78]).

90.   On April 9, 2002, Defendant Warden Leibach sent the plaintiff a memorandum stating that the sources he sent did not constitute written verification from an outside sources nor does prior practice at other facilities serve as written verification that this facility is required to obtain.  (Exhibit [78]).

91.   On April 16, 2002, plaintiff filed an emergency grievance about not being provided with vegan diet stating plaintiff talked with both Defendants Leibach and Wright and mailed each numerous requests for the vegan diet.  (Exhibit Q [78]).

92.   In April 16, 2002, grievance, plaintiff explained about all the materials that clearly demonstrated he was a practicing African Hebrew Israelite in his master file.

9

93. On July 2, 2002, A/W Nichols sent plaintiff a memorandum stating he did not meet the criteria for being put on the vegan diet.  (Exhibit T [78]).

94. On May 21, 2002, Defendants Craven and Snyder's designee denied the plaintiff's appeal to the Director about not being provided the vegan diet at Danville.  (Exhibit Q [78]).

95. When plaintiff received state clothing at Danville, he did not receive any shoes, but he already had a pair of gym shoes.  (Exhibit U & A, Mays Affidavit, ¶ 78 [78] and Defendants' Exhibit E, ¶ 3 [65]).

96. On May 29, 2002, Correctional Officer Footes put in a request for the plaintiff to receive a pair of lightweight canvas shoes for visits.  (Exhibit U & A, Mays Affidavit, ¶ 79 [78]).

97. The plaintiff filed a grievance about inadequate clothing for the season, which was denied by Defendant Leibach on June 20, 2002.  (Exhibit U & V [78]).

98. In plaintiff's grievance June 3, 2002, he states that he was not provided seaters, scarves, gloves, wool socks, winter pants, winter shirts, raingear, shorts, etc.  Plaintiff was made to stand in the rain for 10 minutes by Lt. W. Brown.  (Exhibit U [78]).

99. On July 5, 2001, Defendant Craven recommended that the plaintiff's grievance about inadequate state issued clothing for the seasons be denied [Exhibit V [78]].

**Disputed Material Facts**

100. Plaintiff experienced numbness in his feet, hands, and face, frostbite feeling in body, tightness in hips, back, knees, and ankles, and inability to write coming from yard.  (Exhibit A, Mays Affidavit, ¶ 85)

101. Plaintiff went to the Danville Correctional Center Health Care Unit for cold and flu symptoms from having inadequate clothing to protect him from elements when he went outside for daily one hour yard in rain and when he went to chow he had to stand up to 10 minutes in ran and very cold temperature for "prisoners being not paired up or shirt out." (Exhibit U & A [78]).

102. Plaintiff was seen by Danville's Health Care Unit three times for cold and cold-like symptoms[4] between March 20, 2002 and April 29, 2003, while being seen 20 times during this time span.  (Exhibit A, Mays Affidavit, ¶¶ 43-44 [78]).

**Discussion and Conclusion of Law**

In *Hanrahan v. Lane*, 747 F.2d 1137, 1140-1141 (7th Cir. 1984), the Seventh Circuit stated that allegations of falsified disciplinary reports do not state a claim, provided that the required procedural due process protections set forth in *Wolff v. McDonnell*, 418 U.S. 539 (1974), are met.  *Id.*  "Procedural due process protections are the major means of protection prisoners have from arbitrary government actions . . . ."  Here, the plaintiff received due process on the disciplinary charges.  Therefore, pursuant to Fed. R. Civ. P. Rule 12(b0(6),  Defendant

---

[4] The court has reviewed the plaintiff's medical records.  The records do not support his assertion that he was seen three times for cold and cold-like symptoms between March 20, 2002 and April 29, 2003.

Gaskill is entitled to summary judgment on the plaintiff's claim that Gaskill violated his Fourteenth Amendment due process rights by filing a false incident report.

The court now turns to the Plaintiff's claims that Defendants Snyder, Pierson, Bass, Rojas, Gaskill, German, and Cravens violated Plaintiff's First and Fourteenth Amendment rights by unconstitutionally disciplining him for allegedly eating foods that were not in compliance with Plaintiff's vegan diet.  It would be bizarre for prisons to undertake in effect to promote strict orthodoxy, by forfeiting the religious rights of any inmate observed backsliding, thus placing guards and fellow inmates in the role of religious police. *See Teterud v. Burns*, 522 F.2d 357, 360 (8th Cir.1975).  Additionally, even if the plaintiff's religion has strict fasting rules, the failure of the plaintiff to adhere to the fast does not ...  necessarily require a finding that the plaintiff was insincere in his  beliefs.  *See Reed v. Faulkner*, 842 F.2d 960, 963 (7th Cir. 1988)(inmate's "backsliding" on some of religious tenets not conclusive of sincerity of religious beliefs).  However, when a person is incarcerated, that person retains the right to practice their religion to the extent that the practice is compatible with the legitimate penological interests of the State. *Turner v. Safely*, 107 S. Ct. 2254 (1987).  The Court also held that such a standard is necessary if prison administrators and not the courts, are to make the difficult judgments concerning institutional operations.  *Turner* at 2261. "Both security and economic concerns are legitimate penological demands."  *Mustafa Al- Alamin v. Gramley*, 926 F.2d 680, 686 (7th Cir. 1991). In fact, "[a] prison needs make only reasonable efforts to afford the inmates opportunity to practice their faith." 926  F.2d at 688.  Furthermore, the court, as it must, accords prison officials wide-ranging deference in adopting policies that are needed to preserve internal order and security and the court will not substitute its judgment for theirs in the absence of substantial evidence in the record to indicate officials have exaggerated their response to these considerations.  *Caldwell v. Miller*, 790 F.2d 589 at 596 (7th Cir. 1986).

The Plaintiff is an African Hebrew Israelite and because of his religion he needs a vegan diet.  A vegan diet consists of fleshless meals where no kinds of meat or flesh products or dairy products are consumed.  Special religious diets are expensive and require additional administrative attention to implement.  For example, special outside vendors may be required to supply the food for the diet, contracts for outside vendors have to be approved which require special monetary authorization for purchases from said vendors. (Exhibit B, Manuel Rojas Affidavit, ¶ 3).  Furthermore, depending on the diet and staffing concerns, additional staff may be needed to administer the religious diet to the inmate(s). (Exhibit B, Manuel Rojas Affidavit, ¶ 3). Therefore, an attempt is made to limit special religious diets to those inmates who hold a sincere belief and faithfully observe such diets. (Exhibit B, Manuel Rojas Affidavit, ¶ 3).  Prior to receiving a vegan diet, an inmate must make a request for the diet.  The request must contain written verification that the inmate is a member of a faith group that requires adherence to a particular diet and the specific requirements of the diet. 20 Ill. Admin. Code §425.70(c).  Once the inmate has provided this documentation and the information is verified, the inmate signs a Religious Dietary Agreement.

The Religious Dietary Agreement requires that the inmate refrain from eating and possessing any foods that did not meet the requirements of the diet and that the inmate's

11

participation in the diet would be closely monitored.  The Religious Dietary Agreement also provides that the diet could be terminated if the inmate was found to be non-compliant.  Mr. Mays signed such an agreement.  On December 29, 2001, Defendant Gaskill wrote an Incident Report about witnessing the Plaintiff accepting a regular food tray instead of his vegan food tray. In his response [78], the plaintiff admits that he went through the serving line and took a regular food tray, i.e., non-vegan.  Defendant Gaskill informed Defendant German that the Plaintiff had went through the serving line and took a regular food tray, i.e. non-vegan, even though the Plaintiff was on a vegan diet. The Plaintiff does not know why Defendant Gaskill wrote the December 29, 2001 Incident Report.  Plaintiff admits that on December 29, 2001, he did, at some point in time, have another inmate's tray in his possession.  As a result of this information, Defendant German then observed the Plaintiff eating a from a tray containing a fish sandwich and macaroni and cheese.  He alleges that the plaintiff ate the fish sandwich and the macaroni and cheese.  These items are not served on the vegan diet at Hill Correctional Center and as a vegan, Plaintiff is not to consume said products as they are non-vegan.  The plaintiff claims he did not eat the fish or macaroni and cheese, but instead he only ate the fruit from the tray.  When Defendant German witnessed Plaintiff's conduct, he was aware that Plaintiff had to sign a Religious Dietary Agreement and that a vegan diet required that special foods be purchased, prepared, and served to the inmate on said diet. Since special efforts and money had been made to provide the vegan food trays, it was necessary to insure that those individuals who had requested a vegan diet receive their vegan diet food tray and not a non-vegan food tray. Pursuant to Departmental rule 20 Ill. Admin. Code §504.30(b), if Defendant German witnesses or if he receives information from a reliable witness, that an inmate is violating Departmental rules, he is required to write a Disciplinary Report. Since Defendant German witness the plaintiff take a regular tray, rather than a vegan tray, and in addition, German believed he witnessed the Plaintiff abuse his vegan diet by eating a fish sandwich and macaroni and cheese from a regular food tray, he wrote the Plaintiff a Disciplinary Report for violating Departmental rules 308 – Contraband/Unauthorized Property and 310 – Abuse of Privileges.  Plaintiff admits that on December 29, 2001, he did, at some point in time, have another inmate's tray in his possession.

Defendant German was not involved in decisions concerning whether or not an inmate was to receive a religious diet. German was not involved in determining whether or not the Plaintiff should be removed from the vegan diet. Defendant Rojas received a copy of a December 29, 2001 Incident Report written by Defendant Gaskill. The Incident Report was forwarded to Defendant Rojas by Defendant Bass. When Defendant Rojas receives these reports, he takes them very seriously due to special purchasing and additional money and efforts these diets require. As a result of the information provided to Defendant Rojas, he also decided to check the Plaintiff's commissary purchases to see if he had purchased commissary items that were prohibited by the vegan diet. Defendant Rojas discovered that on December 5 and 19, 2001, the Plaintiff had purchased items that contained milk products or meat, i.e. Hostess pies, pecan pies, Tuna, cheese, Snickers bar. Given the information Defendant Rojas received, he believed that the Plaintiff was not following the requirements of his religion, the vegan diet, and the Religious Dietary Agreement, and in accordance with the procedures established in the Religious Dietary Agreement, the Plaintiff was taken off the vegan diet.  On January 8, 2002, Plaintiff had an Adjustment Committee hearing in which he was found guilty of violating

Department Rule 308 and the recommended discipline was a loss of commissary privileges for 14 days.

The plaintiff was removed from the vegan diet, not for punishment, but because he had violated the Religious Diet Agreement. The facts shows that the plaintiff was not in compliance with the Religious Diet Agreement that he signed on October 7, 2002. He violated paragraph 4 of that Agreement. He admits that he was in possession of a regular tray that contained foods not on his diet and he purchased food from the commissary that were foods not on his diet. Defendant German was required to write the incident report. Based on the foregoing, the Plaintiff has not proven that the decision to remove him from the vegan diet was motivated by any malice toward the Plaintiff or his religion or as a way to hinder the Plaintiff in the practice of his religion. Nor, has Plaintiff proven that the Defendants knew that not serving the Plaintiff a vegan diet would cause an excessive risk to Plaintiff's inmate health and safety and that they intended for Plaintiff to suffer an excessive risk to his health and safety. As far as the plaintiff's claim that the defendants violated his First Amendment rights by punishing him for backsliding, if the court was to accept as a meritorious claim, the only punishment the Plaintiff received was a loss of commissary for 14 days. However, the Constitution does not protect against all arbitrary actions of prison officials, but only those that cause the Plaintiff to suffer a deprivation of a constitutionally protected liberty, life or property interest. *Williams v. Ramos*, 71 F.3d 1246, 1248 (7th Cir. 1995)(per curiam). The only tangible deprivation is the loss of commissary privileges for 14 days. Inmates have no constitutionally protected interest in commissary. Therefore, the Defendants' are entitled to summary judgment on the plaintiff's claim that they violated his due process which resulted in a loss of commissary privileges.

Further, Defendants assert that budgetary planning and security risks are legitimate penological interests to be considered in determining who receives a religious diet and when an inmate can be removed from a religious diet. The court agrees. The Plaintiff has failed to prove that he was removed from the vegan diet by the Defendants for the purpose of violating Plaintiff's First, Eighth and Fourteenth Amendment rights, and are therefore summary judgment on this issue is entered in favor of the Defendants and against the Plaintiff.

Likewise, there was a valid penological interest in having the Plaintiff comply with Departmental Rule 425.70(c) when Plaintiff requested his vegan diet at Danville. As alleges supra, special religious diets are expensive and require additional administrative attention to implement. Since the Plaintiff was found to be non-compliant with the vegan diet, the Religious Dietary Agreement provided that he would have had to wait 30 days (or 60) before re-applying for reinstatement of the diet. Reinstatement of the diet may have required the Plaintiff to re-verify his religion and religious dietary requirements since during this time frame, the Chaplains were discovering that many of the individuals claiming to need or be on the vegan diet were lying in order to have the vegan diet. Further, since it had been determined that Plaintiff did not follow the diet at Hill Correctional Center and considering the costs associated with providing such a diet, it is not unconstitutional to require the Plaintiff to verify that he could follow the diet at Danville Correctional Center. Therefore, a March 28, 2002 memorandum from Defendant Wright was sent to the Plaintiff stating that Plaintiff's request for a special religious diet had

been received.  In the March 28, 2002 memorandum, Plaintiff was notified that in order to proceed with his religious diet request, he would need to provide written verification from a locatable religious leader claiming his affiliation, dietary needs, and any special needs.  On April 9, 2002, a memorandum to the Plaintiff stated that he had not provided written verification of his faith and that as soon as he did, Plaintiff would be provided the contract for the vegan diet.  On May 3, 2002, a letter to the Plaintiff stated that a review of his file and commissary purchases had been performed concerning his diet and it appeared that Plaintiff was not consuming items that were a part of the vegan diet.  Plaintiff was placed on the vegan diet at Danville in October or November 2003.

Since it had been determined that Plaintiff did not follow the vegan diet at Hill Correctional Center (that in its itself is enough) and due to the costs associated with providing such a diet, it was not unconstitutional to require the Plaintiff to verify that he could follow the diet at Danville Correctional Center.  Prison administrators have a legitimate interest in reducing costs and simplifying administration by limiting special diets to those inmates who have a sincere religious need for religious diets.  Furthermore, Plaintiff has not proven that the decision to have him verify his religion for the vegan diet was motivated by any malice toward him or his religion or as a way to hinder him in the practice of his religion.  Nor, has Plaintiff proven that the Defendants knew that not placing the Plaintiff the vegan diet would cause an excessive risk to Plaintiff's inmate health and safety and that they intended for Plaintiff to suffer an excessive risk to his health and safety.  Therefore, since there was a legitimate penological interest with respect to verifying Plaintiff's religious requests especially since he had violated his Religious Diet Agreement concerning his vegan diet, Defendants did not violate Plaintiff's First and Eighth Amendment rights and summary judgment is granted in their favor and against the Plaintiff.

Furthermore, contrary to Plaintiff's allegations that he should not have been removed from the vegan diet prior to a hearing on his December 29, 2001, there is no Departmental rule that requires a Chaplain to wait to remove an inmate from a religious diet until after a hearing and determination has been made about a Disciplinary Report concerning failure to follow the religious diet. (Exhibit B, Manuel Rojas Affidavit, ¶ 28).  Therefore, no due process was implicated when Plaintiff was removed from the vegan diet 5 days prior to his Program Hearing on the December 29, 2001 Disciplinary Report.  Likewise, Plaintiff's due process rights were not violated because he had no liberty interest in his commissary privileges.  As such, summary judgment on this issue is granted in favor of the Defendants and against the Plaintiff.

Finally, the court turns to the plaintiff's claim that Defendant Cooley violated Plaintiff's Eighth Amendment rights by not providing him minimally adequate state issued clothing for the seasons.  The plaintiff arrived at Danville Correctional Center on or approximately, March 21, 2002, spring time.  He already had 1 pair of gym shoes, 3 boxer undershorts, 2 T-shirts, 1 thermal underwear, 2 pairs of socks, 2 sweat pants, 2 sweatshirts, 1 jacket, 1 cap, 1 hat, 1 pair of gloves, 1 pair of gym shorts, 2 sweat pants and 2 sweatshirts.  Further, he received an all purpose jacket,  three lightweight pants, three short sleeved shirt, three briefs, two T-shirts and two [pairs] of socks. Then on or about May 29, 2002, he received a pair of lightweight canvas shoes.  Yet, he alleges that Cooley violated his Eighth Amendment rights by not providing him

14

minimally adequate state issued clothing for the seasons. Based on the selection of clothing that plaintiff had, it appears he was prepared for all seasons -- winter, spring, summer and fall. He alleges that alleges as a fact that he complained of having cold or cold-like symptoms to the Health Care Unit on several occasions. However, his allegations are not supported with documentation. In fact, the documentation that he does provide, his medical records does not bear out his allegations. Plaintiff was seen in the Health Care Unit on March 23, 25, April 25, May 4, 16, 17, July 24, September 24, October 24, 31, November 27, December 12, 23, 26, 2002; January 6, 10, 24, March 6, April 7, and 14, 2003. Of the times the Plaintiff was seen in the Health Care Unit, the only time noted in which he complained of having a cold or cold like symptoms was on September 24, 2002. On that day, it was observed that the Plaintiff's lungs were clear but that he was partially congested when he talked. The Plaintiff was given CTM, an allergy/cold medicine, and was to take one tablet twice a day for 6 days and he was also given an Elbuterol inhaler refill. Plaintiff has a history of having asthma.

Based on the above facts, Plaintiff was provided the relevant clothing for the relevant seasons. There is no constitutional requirement that Plaintiff be outfitted in the style or particular type of clothing Plaintiff would prefer. Additionally, Plaintiff has failed to prove that the clothing he was provided at Danville Correctional Center was motivated by any malice toward the Plaintiff. He has not proven that he had a work assignment such that he would have been given raincoats, rubber boots, thermals, and gloves. Nor has Plaintiff proven that the Defendant Cooley knew that the clothing Plaintiff was receiving would cause an excessive risk to Plaintiff's inmate health and safety and that he intended for Plaintiff to suffer an excessive risk to his health and safety. Furthermore, Plaintiff has not proven that suffered any injury as a result of being cold or wet due to a lack of appropriate clothing. Plaintiff has not proven that he went to the Health Care Unit for being cold, i.e. frostbite or hypothermia. In fact, he does not even claim that these symptoms were during the relevant period of his lawsuit. Instead, Plaintiff went to the Health Care Unit for a common cold and Plaintiff has not shown that the common cold is connected in anyway from not having adequate clothing. Therefore, since Plaintiff has failed to prove that the clothing he received at Danville Correctional Center was provided by Defendant Cooley for the purpose of violating Plaintiff's Eighth Amendment rights and summary judgment on this issue is granted in favor of Defendants and against the Plaintiff.

Based on the foregoing, the court enters the following:

1.    The court vacates its March 30, 2006 order to the extent it denied in part, the defendants' summary judgment motion.
2.    Pursuant to Fed. R. Civ. Pro. Rule 56(c), the Defendants' motion for summary judgment is granted [d/e 64]. The clerk of the court is directed to enter judgment in favor of the Defendants and against the Plaintiff. This case is terminated in its entirety, with the parties to bear their own costs.
3.    If the plaintiff wishes to appeal this dismissal, he may file a notice of appeal with this court within 30 days of the entry of judgment. Fed. R. App. P. 4(a)(4). A motion for leave to appeal *in forma pauperis* should set forth the issues the plaintiff plans to present

15

on appeal.  *See* Fed. R. App. P. 24(a)(1)(C).  If the plaintiff does choose to appeal, he will be liable for the $455.00 appellate filing fee irrespective of the outcome of the appeal. Furthermore, if the appeal is found to be non-meritorious, the plaintiff may also accumulate another strike under 28 U.S.C. 1915(g).

Enter this 16th day of March 2007.

/s/ Harold A. Baker

_____

Harold A. Baker
United States District Judge